Mr. Chief Justice ShaRKey
delivered the opinion of the court.
This bill was filed by the heirs of William W. Lloyd to have the sale of the real and personal estate, made by the executors, set aside for fraud. It charges that Lloyd left a large estate, real and personal, which was much involved, perhaps to the amount of twenty thousand dollars; that amongst other debts, there was one due to the Real Estate Banking Company of Hinds County, for which the land was mortgaged. Elizabeth Lloyd, wife of the testator, was appointed executrix, and John H. Lloyd executor. They qualified as such, but being inexperienced in the management of such business, sought the aid and advice of Grant, who was a distant relative,, and supposed to be *216 a friend of the family, and were governed by his advice and direction. That placing confidence in his professions of friendship and honesty, they permitted him to manage the business as he thought proper. It was their intention to pay the honest debts, and the assets were sufficient for that purpose ; but Grant informed them that the banking company, to which Lloyd was indebted for stock, was gotten up in fraud, and ought not to be paid, and they were induced by his representations so to believe. With a view to avoid this debt, they entered into his arrangements, by which orders of sale were to be procured, and the whole estate sold to him. As an inducement, he agreed to purchase negroes at the sale for the executrix, and that his purchase of the estate should inure to the benefit of the heirs, and the property be returned after the payment of all just debts; that he drew up and gave them an agreement to that effect; that he prevented bidding at the sale, and caused the property to sell for less than its value; that he procured other persons to bid, and to transfer their bids to him, and to quiet some of Lloyd’s in-dorsers, assured them that the land should be held for their benefit; that having obtained titles, he now refuses to account with complainants, or to fulfil his promises, but claims to be the absolute owner of the entire estate, consisting of a large quantity of valuable land, and a number of likely negroes. The executors allege that they were not actuated by improper motives, but were acting with a view to the benefit of the estate. The prayer is, that the sales be set aside, and that Grant be held to account for the rents and profits.
To the bill the respondents first demurred, and the first ground taken for reversing the decree is, that the demurrer was improperly overruled. We do not think, however, that this was erroneous. The bill makes out a case which called for an answer. The respondent is charged -with having improperly procured a sale of the estate for his own benefit; that by fraudulent means he prevented a fair sale of the property for a full consideration, by keeping off competition, and that by such improper means he became the purchaser of the property at a nominal price, to the prejudice of the creditors and distributees. *217 To correct such abuses, by setting aside the sale thus procured, is a common branch of equity jurisdiction. In equity the assets are treated as a trust fund, to be administered by the executor, for the benefit of all persons interested, according to their respective rights or interests. “ Every person who acquires personal assets by a breach of trust or a devastavit by the executor, is responsible to those who are entitled under the will, if he is a party to the breach of trust.” 1 Story, Eq. Jur. § 579, 580, 581; lb. § 422, 423, 424. This was the doctrine involved in the case of Prosser v. Leatherman, 4 How. 237, where many of the decisions in equity are cited; and it seems they establish the proposition, that an improper transfer of any of the assets, by an executor or administrator, with the knowledge and concurrence of the purchaser, imposes on him a liability in equity in favor of those interested. It was then held, that an /illegal transfer of a promissory note to an indorsee with notice, constituted a defence at law; and this was on the principle, that the indorsee under such circumstances could acquire no title. The objection, that the executor, who is complainant, was parliceps criminisy loses its force because others are, also parties, and amongst them infants, who <are not to be prejudiced by the acts of the executor. Nor do we think, that there is force in the objection, that the probate court has jurisdiction of this matter. It certainly could not give all the relief that the case demands, even if it could set aside the sales after they had been approved and affirmed, which, to say the least, is questionable. The case' is then to be considered on the bill, the answers and the proofs.
The appeal was taken from an interlocutory decree setting aside the sale, and for an account; and the first question which is presented in the investigation is, are the orders of sale made by the probate court, valid? If they are so, then it will only remain to inquire whether Grant is a fradulent purchaser. It is alleged in the bill, that the orders of sale were procured at the instigation of Grant, and with a view to carry out his schemes, but there is nothing that can be called satisfactory proof of this allegation. There is no pretence that the debts could have been paid without the saje of the personalty; and whilst it is alleged *218 that the estate was sufficient to pay all the debts, yet it is not alleged that the personal estate alone was sufficient for that purpose. We are therefore to regard the orders of sale, both of the real and personal estate, as valid.
We shall first inquire whether Grant is a fraudulent purchaser of the personal estate, the sale of which was made on the 20th of March, 1840, and prior to the sale of the realty, which was made in September, 1840. The question is one of fact merely, which must depend upon the proof, as the answer positively denies the allegations'of the bill. The first proof is found in two letters of Grant to Mrs. Lloyd, dated the day preceding the sale, and also an unexecuted agreement drawn up by him, all of which are exhibits to the bill. He begins the first letter by suggesting the propriety of having it made known to bidders, that the best security would be required, and no other kind taken; and he gives as a reason for this, that the condition of the estate required purchasers to be prompt. He then advises the sale of four certain negroes with the others, and all to remain on the place, until other arrangements which would secure him well could be made. That he could not think of paying out cash for the estate, and taking property at more than cash prices, and then to let it remain on the place for the benefit of the estate. He assures them that he was actuated by friendly feelings, &c. &c. In the next letter, which was dated the evening before the sale, he informs Mrs. Lloyd that the sickness of his family would prevent him from attending the sale, and that Mr. Williams would therefore represent him in bidding off two negroes for her ■ that if her sons acceded to what was wished and expected of him, to wit, that he should buy the rest of the negroes if they did not sell too high, the horses, farming utensils, &c.; that a rate of hire might be fixed on the negroes by Thomas and J. H. Lloyd, after the title was made to him. He then speaks of the prospect of arranging certain debts to the amount of the property, but that he could not be expected to buy property at an extravagant rate, when his object was to turn the effects into active means for the benefit of the estate, and to keep up and táke good care of the plantation; that he paid his debts promptly *219 and the result would be disastrous to have the property sold to irresponsible men. Being unable to attend the sale, he said he would have to get-her son, William, D. McRae, or Hill to act for him. But he remarked in conclusion, that this proposition was only made on condition, that she could do no better, and requested that if she could make any other arrangement more to her satisfaction, that she would make it. These letters are remarkably verbose and incoherent, so much so that they are scarcely intelligible, yet it is believed that the foregoing remarks cover the substance. The conclusion left on the mind, after reading them is, that some agreement or arrangement had been spoken of previously, but the terms or condition of such agreement are certainly not to be definitely gathered from the letters. They are best understood by the draft of an agreement which was afterwards drawn by Grant, and sent to the parties for their signatures, though it was never executed. That agreement is almost as unintelligible as the letters. Divested of all unnecessary recitals, its substance is about this : that to indemnify the securities of Lloyd, and to prevent the payment of the debt to the Real Estate Banking Company, Grant had been substituted in place of the bidders at the sale, was to receive a title in his own name, and agreed to pay the amount of the property so taken by him, in discharging the debts due by the estate; that he was to receive ten per cent, interest on money paid by him, and to be paid all necessary expenses. The amounts paid out by him were to be refunded in three instal-ments, one third in January, 1842, one third in January, 1843,' and the remaining third in January, 1844. He was to keep the property on the plantation under the superintendence of Thomas Lloyd, provided he purchased the place, and when he was fully paid, he was to reconvey the property. It appears by the testimony, that Grant was not at the sale, but the negroes were bid off by sundry persons, who afterwards relinquished their bids to him. The sale took place on the 20th of March. 1840, and the foregoing agreement bears date the 26th. There is no further proof that Grant employed any person to bid for him, or that any thing was done by him, or by any other person, to depress *220 the price of property. On the contrary, the proof is, that the negroes were sold for very full prices, if any, above their real value. And it also appears that Grant has paid for them. As there was neither combination, fraud, or collusion at the sale, we cannot pronounce it fraudulent. No bidder was deterred from bidding, or persuaded not to do so.- So far as we can judge from the evidence, the sale was a fair one; at least Grant is not implicated. Indeed no one has been defrauded. The negroes sold for a full price, and the estate has been paid. The agreement above described, even if it had been executed, did not make the sale necessarily fraudulent. It seems to have been entirely voluntary on the part of Grant, and it had no influence in deterring bidders, or in causing property to sell for less than its value. When such agreements are made and carried out to the prejudice of the creditors and distributees, they may be fraudulent, but this seems to have been attended with no such, consequences. Nor does it appear in reality that any such agreement was fully executed. In his last letter, Grant informed Mrs. Lloyd, that if she could make a more satisfactory arrangement he wished her to do so. This proves that there was no decisive understanding between the parties. We need not say whether such agreements made by executors or administrators could be tolerated under any circumstances. A sale which is not fraudulent, if regularly made, cannot be set aside. And if it has been made, and such an agreement entered into afterwards, if it be binding, it gives but a right to redeem. But we see no ground for setting aside the sale, and think the vice-chancelloj erred in this particular.
We now proceed to the investigation of the sale of the real estate. This took place in September, 1840, after Grant had acquired most of tíre personal property. The bill represents the same agreement to have existed in reference to both the real and personal estate, but the circumstances attending this sale were very different, and we need only advert to one fact disclosed by the proof, to show this difference. Daniel McCaleb, a witness, went to the sale to purchase some of the land. In conversation with one of the Lloyds, he was informed that the land was to *221 be bought in by Grant for the benefit of the indorsers. He went to Grant, who gave him the same information. In consequence of this understanding, which seemed to exist, he did not bid-There were very few persons at the sale, and that the few who were there were fully informed of this understanding, and influenced by it, we cannot doubt. This conclusion is fortified by the extremely low prices at which the land sold. True, it is said to be subject to a mortgage, but the amount of that mortgage debt has not been shown. We derive some light on this subject from the testimony of Mr. McCaleb, which deserves to be noticed somewhat more at length. He went to the sale for the purpose of bidding, but understood there were indorsers who were likely to be injured, and it was intended that the lands were to be bid off to secure them. He understood from William S. Lloyd, that there was a mortgage to the Real Estate Banking Company of Hinds County, but most of the debts had been paid off in cotton, and that the object of the sale was to secure the indorsers, which could be best effected by the lands being bid off by them. The indorsers named were Grant, Hill, and William S. Lloyd. The lands were worth from three to four dollars per acre. Now it is certain, that there was a combination amongst certain persons to buy the lands. It is also certain, that the effect of that combination was to deter or keep off bidders, and assuming that their object was what they professed it to be, to secure indorsers, though the proof does riot establish that object, that of itself was an illegal purpose. Creditors stand upon an equal footing. A combination amongst a certain class of creditors is fraudulent as to others, and equally so as to all concerned. True, Mr. McCaleb wanted but a small quantity of the land, but the validity of a sale is not to be measured by the extent of injury. There are no degrees in fraud. t *
The voluminous record under consideration furnishes evidence of many other circumstances, which might be mentioned as tending to establish the fact, that there was a combination amongst a few individuals to prevent fair competition at the sale. The recitals in the various deeds and other instruments may be mentioned as instances. It seems to have been thought *222 necessary to furnish an excuse for the low prices, and hence it is generally stated that the land was mortgaged, that it sold low in consequence thereof, no person being willing to risk any thing in purchasing. In taking a deed from the administrator de bonis non for a small tract not sold by the executors, it is recited that the land was scarcely worth paying taxes for. The price bid was five cents per acre. These extraordinary and unusual recitals, in deeds and instruments, evidently prepared by Grant, look suspicious. They look as though they were intended to give apparent fairness to transactions that might be otherwise deemed, unfair. Altogether, we cannot come to any other conclusion than that the sale of the land should be set aside.
It was said in argument, that the heirs had no interest in this matter, inasmuch as the estate had been reported insolvent. The insolvency may have occurred in consequence of the fraud in the sale. Heirs are not precluded by a report of insolvency from showing that the estate has been improperly declared insolvent.
It remains to settle the conditions on which the sale is to be set aside. Grant will be entitled to retain a lien on the land for the amount he has paid on the price of it, with eight per cent, interest. He will be chargeable with reasonable rents, and allowed for permanent and valuable improvements, not to exceed the value of the rent. So far as he has purchased in the widow’s dower he will be entitled to hold it, that being a matter not involved in this controversy. The order for the sale of the land being valid, it must of course be resold under said order, subject to the rights abovementioned. .
The decree is reversed, and cause remanded for proceedings according to this opinion.